IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

JEFFREY SILA,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

**CASE NO. 3:16-CR-448-B**

**PETITION FOR A WRIT OF CORAM NOBIS**

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to N.D. Tex. L.R. 7.4(a), Petitioner certifies the following:

1. Jeffrey Sila, Petitioner

2. United States of America, Respondent

No publicly held corporation or other publicly held entity has a financial interest in the outcome of this case.

*Jeffrey Sila*

Jeffrey Sila, Petitioner Pro Se

Date: June 18, 2025

## TABLE OF CONTENTS

**PETITION FOR A WRIT OF CORAM NOBIS**......................................................1

**JURISDICTION**..................................................................................1

**SUMMARY OF ARGUMENT**..........................................................1

**BACKGROUND**..................................................................................1

**GROUNDS FOR RELIEF: ACTUAL INNOCENCE BASED ON A FAILURE OF PROOF.......2**

    I. The Law of the Case: The Jury Was Bound by a "Wrongful Taking" Instruction.......2

    II. The Government's Theory Collapses: The Jury Note and the On-the-Record Concession.......4

**LEGAL PRINCIPLES AND PRECEDENT: THEFT ≠ SALE**............................................7

    I. Revisiting the § 2255 Ruling in Light of the Binding Jury Instructions.......8

    II. Why Morissette's "Lawful Possession" Exception Is Inapplicable.......9

    III. A Foundation of Precedent: Why Selling is Not Stealing.......9

    IV. National Consensus Among Other Circuits.......11

**CORAM NOBIS RELIEF IS WARRANTED TO PREVENT A GRAVE INJUSTICE..........12**

    I. No Longer in Custody, But Still Suffering Severe Consequences.......12

    II. Justified Delay in Challenging the Conviction.......13

    III. The Error Is Fundamental: Actual Innocence Requires Correction.......16

**CONCLUSION: JUSTICE DEMANDS VACATUR OF A WRONGFUL CONVICTION.....17**

**PRAYER FOR RELIEF**........................................................................17

**VERIFICATION**..................................................................................18

**CERTIFICATE OF SERVICE**...........................................................18

DECLARATION IN SUPPORT OF MOTION..............................................................18

## TABLE OF AUTHORITIES

**Cases**

*Esogbue v. United States*, 357 F.3d 532 (5th Cir. 2004)....................................12, 13

*Hawkins v. United States*, 458 F.2d 1153 (5th Cir. 1972).......................................10

*Morissette v. United States*, 342 U.S. 246 (1952)...............................................3, 9

*Padilla v. Kentucky*, 559 U.S. 356 (2010).............................................................12

*Russell v. United States*, 369 U.S. 749 (1962).....................................................13

*Souza v. United States*, 304 F.2d 274 (9th Cir. 1962)..........................................11

*United States v. Hill*, 835 F.2d 759 (10th Cir. 1987)...............................................11

*United States v. Lesane*, 40 F.4th 191 (4th Cir. 2022)...........................................16

*United States v. Medrano*, 836 F.2d 861 (5th Cir. 1988)...................................10, 11

*United States v. Morgan*, 346 U.S. 502 (1954).......................................................1

*United States v. Reagan*, 596 F.3d 251 (5th Cir. 2010)....................................10, 14

*United States v. Scott*, 789 F.2d 795 (9th Cir. 1986).............................................11

*United States v. Sher*, 418 F.2d 914 (9th Cir. 1969)..............................................11

*United States v. Sila*, 978 F.3d 264 (5th Cir. 2020).............................................6, 14

*United States v. Wyatt*, 737 F.2d 1499 (9th Cir. 1984).........................................11

*United States v. Zettl*, 889 F.2d 51 (4th Cir. 1989)..............................................11

**Statutes**

8 U.S.C. § 1182(a)(2)(B)......................................................................................18

18 U.S.C. § 641................................................................................................1, 9

28 U.S.C. § 1651(a)..............................................................................................1

**28 U.S.C. § 2255**.............................................................................................**2, 8**

**Other Authorities**

**U.S. Attorney's Office, N.D. Tex., Press Release (Sept. 28, 2017)**............................**6**

**APPENDIX**………………………………………………………………………**20**

## PETITION FOR A WRIT OF CORAM NOBIS

### JURISDICTION

This Court has jurisdiction under the **All Writs Act, 28 U.S.C. § 1651(a)**, to grant *coram nobis* relief after a sentence is served when *ongoing collateral consequences* persist. Petitioner meets this standard, facing deportation directly stemming from his conviction. *United States v. Morgan*, 346 U.S. 502 (1954).

### SUMMARY OF ARGUMENT

Petitioner Jeffrey Sila seeks *coram nobis* relief, as he is **actually innocent** of the crime for which he was convicted. This is no mere defense theory, but a **fact unequivocally established by the government's own contradictory admissions.** The government prosecuted Mr. Sila for a "wrongful taking" in 2016, yet at trial conceded the only "taking" occurred in 2015—an act they later admitted Mr. Sila did not commit. Because this conviction rests on a crime that **factually and legally never happened as charged**, this Court is respectfully petitioned to issue a writ of *coram nobis* to correct a **fundamental miscarriage of justice**.

### BACKGROUND

Petitioner was convicted following a jury trial of Theft of Public Funds under 18 U.S.C. § 641 (Count One).[1] He has completed imprisonment and supervised release but

---

[1] Count One served as the predicate offense for a conviction under 18 U.S.C. § 1028A; thus, the outcome of Count One will automatically apply to it as well.

1

continues to endure severe collateral consequences, most significantly deportation.

On direct appeal, the Government's brief contained **critical admissions** confirming its trial evidence focused solely on the 2016 sale of the check—**not the 2015 wrongful taking as charged**. Although a prior 28 U.S.C. § 2255 motion was denied, this Petition presents a new, fundamental claim of actual innocence based on a thorough re-examination of the record and decisive government admissions which prove the evidence was **legally insufficient** to uphold the conviction.

## GROUNDS FOR RELIEF: ACTUAL INNOCENCE BASED ON A FAILURE OF PROOF

Petitioner's claim is one of *actual innocence*, not mere legal innocence. This is not a case where the government simply failed to meet its burden of proof. Rather, the **government's own admissions affirmatively establish that the charged crime—the wrongful taking of the Treasury check from the United States in 2015—was not committed by Petitioner.** Because the undisputed record shows that Petitioner did not commit the specific criminal act alleged in Count One, he is actually innocent of that offense.

### I. The Law of the Case: The Jury Was Bound by a "Wrongful Taking" Instruction

The word "convert" holds both a common meaning – changing the form of something (e.g., converting a check into cash) and a far more serious, precise legal definition. While the Government's entire case encouraged the colloquial understanding, the jury

received a **precise, binding legal instruction** on the law of the case:

> To 'steal' or 'knowingly convert' means to wrongfully take money, property, or thing of value belonging to another with intent to deprive the owner of its use or benefit either temporarily or permanently. Any appreciable change of the location of the property with the intent to deprive constitutes a stealing whether or not there is an actual removal of it from the owner's premises. No particular type of movement or carrying away is required to constitute a taking." (Jury Trial Vol 3, Doc. 150 at 71, App'x 3).

This instruction confined the jury **strictly** to the legal definition of wrongful taking, excluding any colloquial or broader interpretations.

## A. Selling Is the Opposite of Taking

Given this binding instruction, the plain language required the Government to prove a **wrongful taking**. A taking, colloquially and legally, means to receive or gain possession of something; indeed, in *Morissette v. United States*, the Supreme Court held that knowing conversion requires showing more than a defendant taking property **"into his possession."** 342 U.S. 246, 271 (1952). By contrast, a sale—the "single act" the Government admitted was the basis for its case (Appellee's Brief at 23)—is the act of **relinquishing or giving away possession**. These acts are **antonyms**. The Government's evidence that Petitioner sold the check does not satisfy its burden to prove he wrongfully took it. **To convict a man for taking something by proving only that he gave it away is a logical and legal impossibility.**

## B. The Completed Offense: The Theft Was Finalized with the 2015 Mailing

The final sentence of the instruction—"*No particular type of movement or carrying away is required to constitute a taking*"—underscores Petitioner's argument. This clause clarifies

3

that any movement removing property from the owner's possession is sufficient. The **only** "movement or carrying away" that deprived the U.S. Government of its check was the **mailing of the check to Kenya triggered by 2015 filing**. That single act constituted the "appreciable change of location" and the "actual removal... from the owner's premises." (Jury Trial Vol 3, Doc. 150 at 71).

### C. The Jury Was Directed to Consider Only the Charged Crime

Additionally, the jury was specifically instructed:

> You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the second superseding indictment. (Jury Trial Vol 3, Doc. 150 at 67-68, App'x 1-2).

This instruction necessarily directed the jury **not to consider any act of sale**, but only the wrongful taking of the check from the Government.

### D. Intent to Sell ≠ Intent to Deprive

The instruction required the jury to find an **intent to deprive** the Government of its check at the moment of the wrongful taking. The Government's evidence, however, at most attempted to establish an "*intent to sell*," as seen in their own words from closing arguments:

> Counsel asked, "When did the theft occur?" Well, the indictment alleges August 9th. That's the day that he was in possession of it. He had brought it from Africa, he had the intent to sell it and convert it to cash. That's stealing. That's conversion. (Jury Trial Vol 3, Doc. 150 at 50, App'x 4).

This is **legally distinct** from the required "intent to deprive" the owner, the U.S.

4

Government. Accordingly, this third element was not met.

## II. The Government's Theory Collapses: The Jury Note and the On-the-Record Concession

No rational juror could conclude the Government proved a "wrongful taking" based on the August 9, 2016 sale. This is not a mere defense argument—the **Government confronted this fatal contradiction at a pivotal moment during jury deliberations.**

When the jury queried: "Is this correct? Count 1 = Theft of Public Funds ~ 76k Cynthia Short (2016)," (Doc. 99 at 1), the prosecutor, Mr. Stokes, was compelled to respond on the record:

> I think the answer is yes. The only slight inaccuracy — and it may not be
> worth pointing out to the jury — is that the 76K on Count 1 has a year of
> 2016. It's actually 2015. They have the exhibits, and they can determine that,
> but I think the answer is they are correct, yes.(Jury Trial Vol 3, Doc. 150 at 87,
> App'x 5-6).

What the Government tried to minimize as a "*slight inaccuracy*" was a **catastrophic legal failure that destroyed its entire trial theory based on the 2016 sale.** The realization: the wrongful taking **could not have** occurred in 2016—it **could** *only* **have been in 2015**.

At this point, two critical facts became undeniable:

- A "wrongful taking" by Petitioner in 2016, as charged and presented at trial, did **not occur.** It was a **legal and factual impossibility.**

- The only "wrongful taking" of the Treasury check from the U.S. Government indeed happened in **2015**.

The Court's clarification to the Jury, "*Count 1 refers to a theft allegation regarding Cynthia Short*," (Doc. 99 at 1) left no ambiguity—the jury was directed to evaluate the **2015 theft**, defined as a wrongful taking, **not a sale**.

Indeed, the government publicly affirmed this 2015-based theory in its own post-verdict press release, celebrating the conviction as based on Petitioner *"illegally obtaining"* the Treasury check, a clear reference to the fraudulent 2015 tax filing. U.S. Attorney's Office, N.D. Tex., Federal Jury Convicts Man for Theft of Government Funds and Identity Theft (Press Release, Sept. 28, 2017, App'x 11-13).

*https://www.justice.gov/usao-ndtx/pr/federal-jury-convicts-man-teft-government-funds-and-identity-theft*.

Yet, having been forced to concede the 2015 date to secure a conviction, the government executed a **stunning reversal on appeal**. To defend the verdict, it abandoned the more legally sound 2015 timeline and argued that the conviction rested *solely* on the **2016 sale**—the very theory it had disclaimed before in response to the jury question. The Fifth Circuit, for the purposes of its ruling, accepted this new premise. (*United States v. Sila*, 978 F.3d 264, 269 (5th Cir. 2020), App'x 9-10).

## A. The Government's "Moving Target": A Timeline of Contradictory Theories

| Timeline | Government's Stated Theory of Guilt |
|---|---|
| At Trial | The crime was the **2016 sale**. |
| During Jury Deliberations | The crime was the **2015 taking** (Prosecutor's Concession). |

| Post-Verdict | The crime was the **2015** "illegal obtaining" (Press Release). |
| On Appeal | The crime was the **2016 sale** (Appellate Reversal). |

This timeline **starkly illustrates the fundamental uncertainty and unfairness of the proceedings**, where the very nature of the crime changed based on the government's strategic needs, rendering the verdict unreliable and demonstrating a **fatal failure of proof.**

On appeal, the government put in writing that it had failed to prove the 2015 taking it had directed the jury toward:

> The government's evidence did not show that Sila filed the fraudulent tax return related to the Cynthia Short refund. (Appellee's Brief at 18, App'x 7).

> And the government did not focus its case on how the refund check came into Sila's possession—other than to recognize that it probably occurred outside of the Northern District of Texas. (Appellee's Brief at 19, App'x 8).

From these explicit concessions, **three undeniable facts emerge**:

- There was **no** "wrongful taking" by Petitioner in 2016.

- The only "wrongful taking" of the Treasury check from the U.S. Government indeed happened in **2015**.

- Petitioner **did not commit that 2015** "wrongful taking".

These admissions do more than undermine the verdict; they **affirmatively establish Petitioner's innocence.** By conceding that its case rested solely on the 2016 sale—an event where no taking from the government occurred—while admitting it never

7

showed Petitioner committed the actual 2015 taking, the government has confessed to a **fatal failure of proof.** Its own arguments confirm that the **wrong man was convicted of the wrong crime at the wrong time.**

## LEGAL PRINCIPLES AND PRECEDENT: THEFT ≠ SALE

### I. Revisiting the § 2255 Ruling in Light of the Binding Jury Instructions

It is respectfully submitted that the District Court's previous denial of Petitioner's § 2255 motion may not have fully considered the intricate relationship between the charged offense and the precise jury instructions provided. When denying Petitioner's constructive amendment claim, the § 2255 court observed:

> Movant's offense conduct in the underlying criminal case – selling the treasury check for cash – is encompassed by the "stealing" and "conversion" language in the second superseding indictment and jury instructions. Movant fails to show a constructive amendment on this basis, and his claim fails.

This concise dismissal, without a more extensive examination of the specific jury instruction or the government's evolving factual arguments, appears to have **inadvertently overlooked** that the definitions of 'stealing' or 'converting' given to the jury were **expressly and narrowly limited to a 'wrongful taking.'** As previously elaborated, the jury was instructed that 'steal or knowingly convert' signifies to 'wrongfully take money, property, or thing of value belonging to another with intent to deprive the owner of its use or benefit either temporarily or permanently.' This confined legal definition restricts 'conversion' to a wrongful taking from the owner, thereby **excluding a subsequent action such as selling property after it has already passed out**

8

**of government possession.** The court's assertion that a sale is encompassed by a 'taking' seems to be at odds with the specific legal definition presented to the jury, potentially leading to a conviction for an uncharged act. Any assessment of Petitioner's culpability, therefore, should ideally adhere to this precise definition and avoid broader or colloquial interpretations not introduced to the jury. The central inquiry is not whether these concepts can overlap in a general sense, but rather whether, given the facts and the binding jury instructions in this instance, Petitioner's post-taking sale aligns with the charged crime of 'stealing and knowingly converting'—an act for which the evidence was not clearly established.

## II. Why *Morissette's* "Lawful Possession" Exception Is Inapplicable

In *Morissette v. United States*, 342 U.S. 246, 272 (1952), the Court recognized that "*conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful*". This principle clarifies that not all conversion involves wrongful taking. However, this exception does not apply here for two critical reasons:

- The Government's own evidence never established that initial possession of the Treasury check by the Petitioner was "entirely lawful".

- Most crucially, the jury was **rigidly confined** to the precise legal definition of wrongful taking as instructed. Therefore, the Government was required to prove wrongful taking as charged and instructed—and **it failed to do so**.

### III. A Foundation of Precedent: Why Selling is Not Stealing

The foundation of this argument lies in the structure of **18 U.S.C. § 641**, which separates the offenses of one who "*steals, purloins, or knowingly converts*" from one who "*without authority, sells, conveys or disposes of*" government property. The U.S. Court of Appeals for the Fifth Circuit has **strictly enforced this separation**:

- In *Hawkins v. United States*, 458 F.2d 1153, 1156 (5th Cir. 1972), the "*gist of the offense of conversion is wrongfully depriving an owner of his property*," a subsequent "sale" is an "***entirely separate offense***" that requires a "***separate order of proof***".

- In *United States v. Medrano*, 836 F.2d 861 (5th Cir. 1988) the court established that "*separate order of proof*," —the four specific elements required to prove an unauthorized sale:

  1. The property belonged to the United States.
  2. The defendant sold, conveyed, or otherwise disposed of the property.
  3. The defendant acted willfully, knowingly, and without authority.
  4. The value of the property was over $100.

     None of which were presented to the jury in Mr. Sila's case as they were never charged.

- In *United States v. Reagan*, 596 F.3d 251 (5th Cir. 2010):

     Accordingly, we hold that the "allowable unit of prosecution" under § 641 is each individual transaction in which government money is received, even if the transaction is part of an overarching scheme. Reagan violated § 641 each time he converted a HUD check.

  Thus, *Reagan* violated § 641 each time he "*received*" a HUD check. Accordingly, in Petitioner's case, the "wrongful taking" of the check from the U.S. Government was

the "individual transaction" in which the check was "received" from the government as a result of the filing in 2015. **The crime was complete at that moment.** The subsequent sale in 2016 was a separate act and **cannot legally constitute the charged crime of stealing.** Therefore, any interpretation that the 2016 sale constitutes a "continuing" 2015 "wrongful taking" by Petitioner is legally foreclosed.

## IV. National Consensus Among Other Circuits

This legal distinction is not unique to the Fifth Circuit; **other federal circuits are in full agreement**:

- *United States v. Scott*, 789 F.2d 795 (9th Cir. 1986), and *United States v. Zettl*, 889 F.2d 51 (4th Cir. 1989). "**Theft isn't an element of the offense of selling government property without authority.**" *United States v. Sher*, 418 F.2d 914, 915 (9th Cir. 1969). The government itself has noted that "**the theft of this property and the unauthorized sale thereof are not one and the same crime.**" *Souza v. United States*, 304 F.2d 274, 279 (9th Cir. 1962). The Tenth Circuit has also recognized that while § 641 is broad, it has "**internal demarcations of proof which cannot be blurred.**" (*United States v. Hill*, 835 F.2d 759, 763 (10th Cir. 1987)).

- Moreover, *United States v. Wyatt*, 737 F.2d 1499 (9th Cir. 1984), presents **strikingly similar facts**. There, the defendant was convicted for the **unauthorized sale of government property when he sold a stolen United States Treasury check to an undercover agent.** This perfectly illustrates a scenario where a conviction under §

11

641 was based on the sale of a stolen check, **not the act of taking it from the government.** This highlights that the government's evidence against Sila aligns with the sale elements in *Wyatt* and *Medrano*, but Sila's jury was not instructed on these distinct "sale" elements for Count One. The government charged, and the jury was instructed, only on the "wrongful taking" aspect. The only conduct proven was Petitioner's 2016 sale of the check after the wrongful taking was complete and not perpetrated by Petitioner. This sale, occurring after the wrongful taking was complete and not perpetrated by Petitioner, isn't the "wrongful taking" by Petitioner from the government as defined for the jury.

This unambiguous line of precedent demonstrates that the government's case was **fundamentally flawed**. It charged a "taking" offense that was completed in 2015 but based its proof entirely on a legally distinct "sale" offense from 2016, failing to meet the legal requirements for either crime. This conflation of offenses **fatally undermines the sufficiency of the evidence and the validity of the conviction.**

## CORAM NOBIS RELIEF IS WARRANTED TO PREVENT A GRAVE INJUSTICE

The writ of *coram nobis* is an extraordinary remedy for correcting fundamental errors when a petitioner (1) is no longer in custody, (2) faces ongoing collateral consequences, (3) has a valid reason for the delay in challenging the conviction, and (4) shows the error is fundamental. *United States v. Esogbue*, 357 F.3d 532, 534 (5th Cir. 2004).

Petitioner meets all four prongs:

**I. No Longer in Custody, But Still Suffering Severe Consequences**

Although the petitioner has completed his lengthy prison sentence, he continues to endure **severe ongoing collateral consequences.** Most significantly, his felony conviction carries direct immigration repercussions, rendering him removable from the country and ineligible for discretionary relief. (*Padilla v. Kentucky*, 559 U.S. 356, 368 (2010)). The Fifth Circuit presumes such consequences flow from a felony conviction. (*Esogbue*, 357 F.3d at 534).

**II. Justified Delay in Challenging the Conviction**

The delay in seeking this remedy is entirely understandable and justified, primarily due to the **government's constantly shifting theories regarding the alleged crime**, which created profound ambiguity and *"infected proceedings"* with *"unfairness and uncertainty."* (*Russell v. United States*, 369 U.S. 749, 770 (1962)).

Consider the timeline:

- **Trial**: The government alleged a 2016 sale.

- **Jury Deliberations**: The theory abruptly shifted to a 2015 "taking."

- **Appeal**: The government reverted to the 2016 sale theory.

While Petitioner consistently attempted to highlight aspects of this fundamental unfairness, the full crystallization of the error, particularly how the government's contradictory admissions and actions demonstrated actual innocence based on a failure of proof, could not be fully identified or articulated until this thorough re-examination

13

of the entire record.

His efforts to correct this injustice have been a **continuous, arduous struggle**, often undertaken through extreme financial hardship:

- **Initial Pro Se Attempts**: Before sentencing, he filed a *pro se* motion for acquittal (Doc. 185 at 16, App'x 14). When the court rejected it and his trial counsel ignored his pleas, he requested a *Faretta* hearing (Doc. 184 at 2, App'x 15). His specific goal was to get his arguments directly on the record to preserve them for appeal and avoid the restrictive "plain error" standard (Doc. 184 at 25).

- **Facing Harsh Warnings**: At the *Faretta* hearing on February 8, 2018, he was explicitly warned he faced a harsh sentence of up to twenty-two years (Doc. 184 at 6, App'x 16) and that representing himself was a "bad idea" that would likely result in a "less favorable" or "higher sentence" (Doc. 184 at 8, 19, App'x 17, 18). He proceeded, believing it was his only path to having his claims heard.

- **Sentencing Denials**: At the sentencing hearing on September 20, 2018, the court orally denied his *pro se* motions for a new trial and acquittal, stating they were both untimely and failed on the merits (Doc. 185 at 7, 18-19, App'x 19, 20-21). He then received the very harsh 97-month sentence he fought to avoid (Doc. 185 at 59-60, App'x 22-23).

- **Appellate Counsel Failures**: On appeal, the issues he risked so much to preserve were never raised by his new appellate counsel, Mr. Niles Illich, who saw no merit and prepared to file an *Anders* brief.

14

- **Shifting Legal Strategies and Further Setbacks:**

  - To prevent forfeiture, he was forced to retain Mr. Clinton Broden, who correctly framed the core error as a sufficiency of the evidence claim based on the legal and factual impossibility of stealing the same check twice under *United States v. Reagan*. However, Mr. Broden refused to brief a challenge to Count Three.

  - This led to retaining Ms. Nancy Barohn, who abandoned Mr. Broden's sound legal argument and improperly interpreted the verdict colloquially as "converting the check into cash through a sale"—a flawed theory the government then adopted (*United States v. Sila*, 978 F.3d 264, 269 (5th Cir. 2020)). Ironically, Ms. Barohn succeeded on the very count Mr. Broden had refused to challenge.

  - Following resentencing, retained counsel Mr. Russell Lorfing attempted to raise the constructive amendment claim, but the appeal was summarily dismissed on procedural grounds. Critically, counsel failed to argue the miscarriage of justice exception that could have overcome the procedural bar.

- **Habeas Proceedings and Core Claim Abandonment**: In his 28 U.S.C. § 2255 proceedings, Petitioner was again forced to initiate his case *pro se* and was denied counsel twice. After retaining his final counsel, Mr. Brent Newton, the *pro se* motion—which already contained the core claim—was amended to add a new issue of venue. Following counsel's amendment, the critical constructive amendment claim was summarily denied by the court with only a one-line

15

response. The court asserted that "selling for cash" is encompassed by the charged crime—the very legal error this petition seeks to remedy. The subsequent appeal for a Certificate of Appealability (COA) then focused solely on the venue issue, abandoning the core claim for the last time.

This exhaustive history demonstrates a continuous, yet procedurally thwarted, effort by the petitioner to have the court recognize and correct the **fundamental injustice** inherent in his conviction. This prolonged process—marked by repeated changes in counsel and numerous continuances—has now taken so long that the petitioner has fully completed his lengthy prison sentence, yet the fundamental injustice of his conviction remains unresolved. The accumulation of these procedural roadblocks and summary dismissals without substantive review provides sound reason for the timing of this *coram nobis* petition.

### III. The Error Is Fundamental: Actual Innocence Requires Correction

The error in this case is **undeniably fundamental.** As recognized in the recent and directly relevant *coram nobis* case, *United States v. Lesane*, **40 F.4th 191 (4th Cir. 2022)**, "***actual innocence, if proved, serves as a gateway through which a petitioner may pass…a procedural bar...***" The *Lesane* court powerfully described the error as "*difficult to imagine an error of more fundamental character than a conviction for an offense the person did not commit.*" It stressed that the prosecution's goal "*is not that it shall win a case, but that justice shall be done.*" *Coram nobis* exists precisely to "*achieve justice*" by correcting wrongful convictions, particularly where actual innocence is established.

16

## CONCLUSION: JUSTICE DEMANDS VACATUR OF A WRONGFUL CONVICTION

To uphold this conviction would be to punish a man for a crime he did not commit—an injustice the law cannot tolerate. To allow this conviction to stand would be to endorse a verdict that the government itself has, through its own contradictory words and admissions, proven to be a fiction. The writ of *coram nobis* exists precisely to prevent such a **fundamental miscarriage of justice.**

### PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Honorable Court:

1. **GRANT** this Petition for Writ of Error Coram Nobis;
2. **VACATE** the conviction on Count One of the second superseding indictment, based on Petitioner's actual innocence of the charged elements; and
3. **ORDER** an evidentiary hearing on Petitioner's claim of actual innocence; and
4. **ORDER** such further relief as this Court deems just and proper.

Respectfully submitted,

Date: June 18, 2025

*Jeffrey Sila*

Jeffrey Sila, Petitioner Pro Se
7521 Anderson St
Lenexa, KS, 66227
jeffreysila@gmail.com

## VERIFICATION

I, Jeffrey Sila, declare under penalty of perjury that I am the Petitioner in the above-entitled action; that I have read the foregoing **PETITION FOR A WRIT OF CORAM NOBIS** and know the contents thereof; and that the matters stated therein are true and correct to the best of my knowledge, information, and belief.

Executed on: June 18, 2025

*Jeffrey Sila*

Jeffrey Sila, Petitioner Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2025, I submitted the foregoing Petition for a Writ of Coram Nobis to the Clerk of Court for the Northern District of Texas, located at 1100 Commerce Street, Third Floor, Dallas, Texas 75242, for filing via the Court's CM/ECF system. All parties of record will be served through the Court's electronic filing notifications.

*Jeffrey Sila*

Jeffrey Sila, Petitioner Pro Se
Date: June 18, 2025

18

## DECLARATION IN SUPPORT OF MOTION

I, **JEFFREY SILA**, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the Petitioner in the above-entitled action and am familiar with the facts set forth herein.

2. I am currently subject to removal proceedings initiated by the U.S. Department of Homeland Security. These proceedings directly stem from my criminal convictions in this Court, specifically Count One (Theft of Public Funds under 18 U.S.C. § 641) and the related Count 1028A (Aggravated Identity Theft).

3. My immigration counsel has informed me, and I understand, that I am deemed **inadmissible to the United States** under federal immigration law due to my criminal record. Specifically, I am inadmissible under Section 212(a)(2)(B) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1182(a)(2)(B).

4. This provision states:"Any alien who has been convicted of two or more offenses, other than purely political offenses, regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement actually imposed were five years or more is inadmissible." 8 U.S.C. § 1182(a)(2)(B).

5. My convictions for Theft of Public Funds (Count One) and Aggravated Identity Theft (Count 1028A) resulted in aggregate sentences of confinement that exceed five years: **87 months (7 years and 3 months)**; well over the five-year threshold, rendering me inadmissible under the aforementioned statutory provision.

6. I attest that the statements contained herein are true and correct to the best of my knowledge, information, and belief.

Executed on: June 18, 2025

*Jeffrey Sila*

Jeffrey Sila, Declarant

19

# APPENDIX

## Table of Contents

**Exhibit 1**

- **Description:** Jury Trial Transcript (Excerpt: Jury Instruction on Charged Crime - "You are here to decide whether the government has proved... not alleged in the second superseding indictment.")
- **Original Source (Doc. No. & Page/Range):** Doc. 150 at 67-68
- **Appendix Page:** 1-2

**Exhibit 2**

- **Description:** Jury Trial Transcript (Excerpt: Jury Instruction on "Steal" or "Knowingly Convert" - "To 'steal' or 'knowingly convert' means to wrongfully take money...")
- **Original Source (Doc. No. & Page/Range):** Doc. 150 at 71
- **Appendix Page:** 3

**Exhibit 3**

- **Description:** Jury Trial Transcript (Excerpt: Prosecution Closing Argument - "Counsel asked, 'When did the theft occur?'...")
- **Original Source (Doc. No. & Page/Range):** Doc. 150 at 50
- **Appendix Page:** 4

**Exhibit 4**

- **Description:** Jury Note and Court's On-the-Record Response
- **Original Source (Doc. No. & Page/Range):** Doc. 99 at 1 (Prosecutor's response also cited as Jury Trial Vol 3, Doc. 150 at 87)
- **Appendix Page:** 5-6

**Exhibit 5**

- **Description:** Appellee's Brief (Excerpt: Government's Admission - "The government's evidence did not show that Sila filed the fraudulent tax return...")
- **Original Source (Doc. No. & Page/Range):** Appellee's Brief at 18
- **Appendix Page:** 7

**Exhibit 6**

- **Description:** Appellee's Brief (Excerpt: Government's Admission - "...the

government did not focus its case on how the refund check came into Sila's possession...")

- **Original Source (Doc. No. & Page/Range):** Appellee's Brief at 19
- **Appendix Page:** 8

**Exhibit 7**

- **Description:** United States v. Sila, 978 F.3d 264, 269 (5th Cir. 2020) (Excerpt)
- **Original Source (Doc. No. & Page/Range):** 978 F.3d 264, 269
- **Appendix Page:** 9-10

**Exhibit 8**

- **Description:** U.S. Attorney's Office, N.D. Tex., Press Release (Sept. 28, 2017)
- **Original Source (Doc. No. & Page/Range):** Press Release (URL in petition: [https://www.justice.gov/usao-ndtx/pr/federal-jury-convicts-man-teft-government-funds-and-identity-theft](https://www.justice.gov/usao-ndtx/pr/federal-jury-convicts-man-teft-government-funds-and-identity-theft))
- **Appendix Page:** 11-13

**Exhibit 9**

- **Description:** Petitioner's Pro Se Motion for Acquittal
- **Original Source (Doc. No. & Page/Range):** Doc. 185 at 16
- **Appendix Page:** 14

**Exhibit 10**

- **Description:** Petitioner's Request for Faretta Hearing
- **Original Source (Doc. No. & Page/Range):** Doc. 184 at 2
- **Appendix Page:** 15

**Exhibit 11**

- **Description:** Hearing Transcript (Excerpt: Warning at Faretta Hearing regarding harsh sentence - up to twenty-two years)
- **Original Source (Doc. No. & Page/Range):** Doc. 184 at 6
- **Appendix Page:** 16

**Exhibit 12**

- **Description:** Hearing Transcript (Excerpt: Warning at Faretta Hearing regarding "bad idea" of self-representation - "less favorable" or "higher sentence")
- **Original Source (Doc. No. & Page/Range):** Doc. 184 at 8, 19
- **Appendix Page:** 17, 18

21

**Exhibit 13**

- **Description:** Sentencing Hearing Transcript (Excerpt: Court's Oral Denial of Pro Se Motions for new trial and acquittal, untimely and failed on merits)
- **Original Source (Doc. No. & Page/Range):** Doc. 185 at 7, 18-19
- **Appendix Page:** 19, 20-21

**Exhibit 14**

- **Description:** Judgment in a Criminal Case (Imposed Sentence: 97 months)
- **Original Source (Doc. No. & Page/Range):** Doc. 185 at 59-60
- **Appendix Page:** 22-23

---

1  Dietrich Eipper's return was filed.  There is no

2  evidence of its capability.  In fact, Agent Manning

3  told you it rolled out just a little while ago; it's

4  barely been operational.  Let me ask you, is that

5  really an issue with respect to whether this

6  defendant stole and was in possession with intent to

7  deprive the government of the Treasury Check?

8  Whether or not where that return came from, Cynthia

9  Short, he's trying to sell the Treasury Check.

10 That's the government property that is being stolen

11 and converted.

12          Counsel asked, "When did the theft occur?"

13 Well, the indictment alleges August the 9th.  That's

14 the day that he was in possession of it.  He had

15 brought it from Africa, he had the intent to sell it

16 and convert it into cash.  That's stealing.  That's

17 conversion.

18          Agent Lydia Breaux.  If, in fact, the

19 government had provided her $30,000 of this 48, why

20 didn't defense counsel cross-examine Agent Manning

21 about that?  "What is your relationship with Lydia

22 Breaux?"  She told you, she's been arrested and

23 she's charged.  Reasonable inference from the

24 evidence, as was testified to by Agent Manning, he

25 spent the money.  Did he give her a cut?  I would

```
 1   right to give the testimony of that witness whatever
 2   weight you think it deserves.
 3                        On or About
 4           You will note that the second superceding
 5   indictment charges that the offenses were committed
 6   on or about a specific date.  Although it is
 7   necessary for the government to prove beyond a
 8   reasonable doubt that the offense was committed on a
 9   date reasonably near the date alleged in Counts 1, 2
10   and 3 of the second superceding indictment, it is
11   not necessary for the government to prove that the
12   offense was committed precisely on the date charged.
13             Single Defendant - Multiple Counts
14           A separate crime is charged in each count
15   of the second superceding indictment.  Each count,
16   and the evidence pertaining to it, should be
17   considered separately.  The fact that you may find
18   the defendant guilty or not guilty as to one of the
19   crimes charged should not control your verdict as to
20   any other.
21        Caution - Consider Only the Crimes Charged
22           You are here to decide whether the
23   government has proved beyond a reasonable doubt that
24   the defendant is guilty of the crimes charged.  The
25   defendant is not on trial for any act, conduct, or
```

Case 3:16-cr-00043-B   Document 240   Filed 06/29/18   Page 30 of 50   PageID 2284
Case 3:16-cr-00043-B   Document 190   Filed 06/29/18   Page 68 of 98   PageID 2342

68

```
 1   offense not alleged in the second superceding
 2   indictment.  Neither are you called upon to return a
 3   verdict as to the guilt of any other person or
 4   persons not on trial as a defendant in this case,
 5   except as you are otherwise instructed.
 6                    Caution - Punishment
 7            If a defendant is found guilty, it will be
 8   my duty to decide what the punishment will be.  You
 9   should not be concerned with punishment in any way.
10   It should not enter your consideration or
11   discussion.
12            Cautionary Instruction During Trial
13         Transcript of Tape Recorded Conversation
14            Certain exhibits have been identified as
15   typewritten transcripts of the oral conversations
16   that can be heard on the tape-recording received in
17   evidence.  These transcripts also purport to
18   identify the speakers engaged in such conversations.
19            I have admitted the transcripts for the
20   limited and secondary purpose of aiding you in
21   following the contents of the conversations as you
22   listen to the tape recordings, and also to aid you
23   in identifying the speakers.
24            You are specifically instructed that
25   whether a transcript correctly or incorrectly
```

```
 1   and with the intent to deprive the owner of the use

 2   of the money, property, or thing of value.

 3              The word "value" means the face, par, or

 4   market value, or cost price, either wholesale or

 5   retail, whichever is greater, of all such things of

 6   value that you find the defendant has stolen or

 7   knowingly converted.

 8              It is not necessary to prove that the

 9   defendant knew that the United States Government

10   owned the property at the time of the wrongful

11   taking.

12              To "steal" or "knowingly convert" means to

13   wrongfully take money, property, or thing of value

14   belonging to another with intent to deprive the

15   owner of its use or benefit either temporarily or

16   permanently.  Any appreciable change of the location

17   of the property with the intent to deprive

18   constitutes a stealing whether or not there is an

19   actual removal of it from the owner's premises.

20              No particular type of movement or carrying

21   away is required to constitute a taking.

22   Aggravated Identity Theft and Aiding and Abetting -

23                          Count Two

24              Count Two of the second superceding

25   indictment charges the defendant with a violation of
```

```
 1              THE COURT:  Anything else?
 2              MR. STOKES:  No.
 3              MR. TYSON:  No, ma'am.
 4              THE COURT:  We will be in recess.
 5              (Recess taken.)
 6              (In open court at 12:30 p.m.)
 7              THE COURT:  Counsel, we have a note.  It
 8    is -- everybody has it, and it's filed among the
 9    papers of the case.  And so the question is, as you
10    can see -- let me do something before I hear from
11    you-all.  Okay.  I'm sure you have some suggested
12    responses, and I would like to hear from each of
13    you.
14              Mr. Stokes first.
15              MR. STOKES:  I think the answer is yes.
16    The only slight inaccuracy -- and it may not be
17    worth pointing out to the jury -- is that the 76K on
18    Count 1 has a year of 2016.  It's actually 2015.
19    They have the exhibits, and they can determine that,
20    but I think the answer is they are correct, yes.
21              THE COURT:  Okay.  And Mr. Tyson -- let me
22    tell you what my concerns are.  Well, let me hear
23    from you first.
24              MR. TYSON:  Well, Your Honor, I think we
25    should just tell them, "You have all the law and
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

SEP 2 7 2017

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| | § | CRIMINAL ACTION NO: |
| v. | § | 3:16-CR-448-B |
| | § | |
| JEFFREY NDUNGI SILA, | § | |
| Defendants. | § | |

## RESPONSE TO JURY NOTE #1

Members of the Jury:

    You have submitted a note with the following question:

Question 1:

    "Is this Correct?

        Count 1 = Theft of Public Funds ~ 76K - Cynthia Short (2016)

        Count 3 = Theft of Public Funds ~ 9K - Dietrich Eipper (2012)"

                /s/ Richard Walker
                9-27-17

Court Response to question 1:

    In response to your question,

        Count 1 refers to a theft allegation regarding Cynthia Short.

        Count 3 refers to a theft allegation regarding Dietrich Eipper.

occurred in the Northern District of Texas (let alone, the Dallas Division)—the sale of the refund check. (ROA.891, 905.) The fraudulent tax return for Cynthia Short was filed in Kenya, (ROA.1012-13, 1100; GX27 at 15), and—although the record is not clear about exactly how, when, or where Sila acquired the refund check—the reasonable inference is that Sila obtained it in Kenya, (Brief at 23; ROA.1243). Because only one act occurred in the Dallas Division of the Northern District of Texas, that act is the only basis on which the government could have charged Sila and the only basis on which the jury could have convicted Sila. (*See* Fed. R. Crim. P. 18 ("the government must prosecute an offense in a district where the offense was committed"); Brief at 26; ROA.116, 422, 867, 1286-87.) Put simply, there is no risk that the jury convicted Sila based on any other conduct than his sale of the check. (ROA.422, 1286-87.)

Third, the government's evidence at trial confirms that it only had one theory underlying Count 1—*i.e.*, that Sila committed theft of public funds by selling the fraudulent refund check. The government presented audio and visual recordings of that August 9, 2016 transaction, and had several witnesses testify about it. (ROA.891, 919-32, 998-1000, 1179; GX18; GX20; GX21-23.) As Sila concedes in his brief, the government's evidence did not show that Sila filed the fraudulent tax return related to the Cynthia Short refund. (Brief at

23.)  And the government did not focus its case on how the refund check came

into Sila's possession—other than to recognize that it probably occurred

outside of the Northern District of Texas.  (Brief at 23; ROA.1243.)  Because

the government presented a single theory underlying Count 1, there is no risk

the jury convicted Sila on any other basis.

Fourth, the government's closing argument confirms that Count 1 was

based solely on the August 9, 2016 sale.  At the outset of its closing, the

government stated: "Count 1 is that 76,000-dollar cashier's check, right?  We

heard from the undercover agent.  We heard of that transfer of that check from

the defendant to the undercover agent.  That's Count 1."  (ROA.1239.)  The

government went on and made the point more plainly by stating that "[t]here's

48,000 given from the undercover agent to Mr. Sila.  That—*specifically, that*

*transaction is all we are talking about really when we are talking about Count 1*."

(ROA.1239-40 (emphasis added).)  And, in response to Sila's argument about

"when" the theft occurred, the government made clear that "the theft

occur[red]" when the indictment said it did—on "August the 9th."

(ROA.1269.)[7]

---

[7] *See also* ROA.1269 (arguing that its evidence was not about "where that return came from" because Sila was "trying to sell the Treasury Check.  That's the government property that is being stolen and converted"); ROA.1241 ("What's even more telling is the second time that they decide to meet [on August 9, 2016]. When the money is actually exchanging hands, Mr. Sila is actually having the check in his possession, actually accepting the money, actually giving his contact info at that point.").)

No. 17-11212

a sale in Dallas would constitute another." He says that, because the Government proved that the Short tax refund was filed in Kenya in April 2015 (the Government did not prove who filed it) and proved that the check was sold in Dallas in August 2016, the conduct in each location must be treated as separate offenses and the jury should have been instructed accordingly. Sila says that the Government advanced both theories at trial and notes several instances when the Government mentioned Sila's conduct in Kenya.

To support this argument that the jury needed to be instructed that it must be unanimous as to whether the conduct in Kenya or Dallas formed the basis for Count I, Sila relies on *Holley*, 942 F.2d 916. In *Holley*, the defendant was charged with two counts of perjury and each count alleged multiple perjurious statements. *Id.* at 927. He argued on appeal that a unanimity instruction was necessary to ensure that the jury was unanimous as to at least one statement alleged in each of the two counts. *Id.* at 925. We agreed and determined that a unanimity of theory instruction was required because each count of the indictment "allege[d] multiple false statements" and "[t]he [G]overnment was required to prove dissimilar facts to show the knowing falsity of each statement." *Id.* at 928. Without a unanimity of theory instruction, there was "a reasonable possibility that the jury was not unanimous with respect to at least one statement in each count." *Id.* at 929.

The Government does not dispute that Sila's conduct in Dallas and his conduct in Kenya could have theoretically constituted two separate violations of § 641. Rather, the Government maintains that it sought to convict Sila on Count I based only on his conduct in Dallas. Therefore, the Government argues, the district court did not err in failing to give a unanimity of theory instruction as to the location of the crime.

5

No. 17-11212

Sila is correct that, *if* the Government had alleged he violated § 641 in Kenya and/or in Dallas, then a unanimity of theory instruction consistent with *Holley* would have been required.  But the United States did not allege two offenses in two locations, or even that one offense occurred across two locations.  The indictment is instead based solely on the August 9, 2016 Dallas transaction—made over a year after the fraudulent tax refund in Short's name was filed in Kenya.  The indictment alleged that the crime occurred on or about August 9, 2016 "in the Dallas Division of the Northern District of Texas," not in Kenya.  Plus, the facts alleged in Count I correspond to the August 9, 2016 transaction, and cannot be reasonably construed to relate to any conduct performed at a much earlier date on a different continent.  Unlike the indictment in *Holley*, Count I of Sila's indictment does not allege "multiple" offenses or "embrace[] two or more separate offenses, though each be a violation of the same statute." *Holley*, 942 F.2d at 927.

The record also fails to vindicate Sila's portrayal of the trial and his argument that the jury could have been confused. *See id.* at 926.  He cites the Government's closing argument, where the prosecutor said: "When did the theft occur?  Well, the indictment alleges August the 9th.  That's the day he was in possession of [the Short tax refund].  He had brought it from Kenya, he had the intent to sell it and convert it to cash.  That's stealing.  That's conversion."  Far from proving that the Government charged Sila for his conduct in Kenya, this quote bolsters the Government's argument that "the theft occurred . . . on August the 9th"—when Sila was in Dallas, not Kenya.  He notes another moment from the Government's closing argument: "And where did Mr. Sila come from to come to the United States with that check?  It was Kenya."  Context is key.  In this portion of its closing argument, the United States was not emphasizing the fact that Sila traveled to the United States from Kenya, but rather that Sila's coming from Kenya was further

6

Appendix 10

6/18/25, 1:03 AM     Northern District of Texas | Federal Jury Convicts Man of Theft of Government Funds and Identity Theft | United States Department of Justice

Case 3:16-cr-00448-B     Document 240     Filed 06/27/25     Page 38 of 50     PageID 2292



**PRESS RELEASE**

# Federal Jury Convicts Man of Theft of Government Funds and Identity Theft

Thursday, September 28, 2017

**For Immediate Release**

U.S. Attorney's Office, Northern District of Texas

**DALLAS** — Following a three-day trial before U.S. District Judge Jane J. Boyle, a federal jury convicted Jeffrey Sila, 32, a citizen of Nairobi, Kenya, yesterday on two counts of theft of public funds and one count of aggravated identity theft, announced U.S. Attorney John R. Parker of the Northern District of Texas.

Sila is to be sentenced by U.S. District Judge Jane J. Boyle on January 11, 2018.  The maximum statutory penalty for the identity theft count is a mandatory term of two years in prison and a $250,000 fine.  The maximum statutory penalty for the theft of public funds counts are a maximum statutory penalty of ten years in prison and a $250,000 fine.  Sila has been in custody since the time of his arrest in September 2016.

The government presented evidence at trial that Sila illegally obtained a $76,592.86 United States Treasury check payable to an individual identified as C.S. that had been issued on a federal income tax return filed electronically from Kenya.  On August 9, 2016, Sila delivered the treasury check to an Internal Revenue Service (IRS) Criminal Investigation (CI) undercover agent in exchange for $48,000.  Sila was arrested on September 11, 2016, at Los Angeles airport as he attempted to board a flight to Nairobi, Kenya.  Sila was also convicted of the theft of another treasury refund check that had been issued on an electronically filed return filed in 2012.

<span style="color:#c0392b">**Appendix 11**</span>

The case was investigated by IRS-CI. Assistant U.S. Attorneys Christopher Stokes and Sid Mody are prosecuting.

# # #

**Contact**

Lisa Slimak

214-659-8600

Lisa.Slimak@usdoj.gov

*Updated September 28, 2017*

**Topic**

| **FINANCIAL FRAUD**

**Component**

USAO - Texas, Northern

# Related Content

**PRESS RELEASE**

**Two Texas Residents Operating a Visa Racket Indicted for Visa Fraud, Money Laundering, and RICO Conspiracy**

Two Texas residents, Abdul Hadi Murshid, 39, and Muhammad Salman Nasir, 35, both originally from Pakistan, a law firm, and a business entity were charged by indictment with conspiracy to defraud the United...

**Appendix 12**

6/18/25, 1:03 AM    Northern District of Texas | Federal Jury Convicts Man of Theft of Government Funds and Identity Theft | United States Department of Justice

Case 3:16-cr-00448-B    Document 240    Filed 06/27/25    Page 40 of 50    PageID 2294
May 23, 2025

---

**PRESS RELEASE**

## North Texas Concrete Manufacturer Settles PPP Lawsuit for $1.8 Million

Speed Fab-Crete Corporation, a precast concrete manufacturer in Kennedale, Texas, agreed to pay $1,817,546.25 to resolve allegations that the company violated the False Claims Act by applying for and receiving...

March 20, 2025

---

**PRESS RELEASE**

## Mansfield Tax Preparer Sentenced in Tax and PPP Loan Fraud Schemes, Ordered to Pay $10.2 million in Restitution

A former Mansfield tax preparer who previously pled guilty to charges related to his false preparation of tax returns was sentenced last week to nearly 5 years in federal prison.

March 10, 2025

---

✉ **Northern District of Texas**

1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

📞 Dallas: 214-659-8600
Fort Worth: 817-252-5200
Lubbock: 806-472-7351
Amarillo: 806-324-2356

**Appendix 13**

```
 1                (In open court at 2:00 p.m.)
 2                THE COURT:  All right.  Next case up is a
 3    hearing in 3:16-CR-0448, U.S. v. Sila.
 4                For the government.
 5                MR. STOKES:  Chris Stokes.
 6                THE COURT:  Mr. Stokes.
 7                For the defendant.
 8                MR. TYSON:  Ezekiel Tyson and Dimitri
 9    Dube.
10                THE COURT:  Good afternoon.
11                MR. TYSON:  And we have Mr. Sila.
12                THE COURT:  We will have Mr. Sila come to
13    the lectern, unless you want to talk to him for a
14    minute.
15                MR. TYSON:  No, Your Honor.
16                THE COURT:  Good afternoon, Mr. Sila.
17                DEFENDANT SILA:  Good afternoon, ma'am.
18                THE COURT:  It's been a long journey for
19    you here, hasn't it?
20                DEFENDANT SILA:  Yes, ma'am.
21                THE COURT:  You are here today because you
22    filed a notice or a request with the Court to
23    proceed pro se.  That's what I'm here to talk to you
24    about.  Okay?
25                DEFENDANT SILA:  Yes, Your Honor.
```

```
 1   counts of theft of public funds, each carrying a
 2   statutory maximum of ten years.  There's also a
 3   third count of aggravated identity theft with a
 4   mandatory consecutive two years.
 5          THE COURT:  So maximum, what would he
 6   possible be looking at?
 7          MR. STOKES:  Twenty-two years.
 8          THE COURT:  And this would be in your
 9   view, Mr. Stokes -- I know you have been at the U.S.
10   Attorney's Office for some time -- perhaps on a
11   scale of simple possession of a drug case to a fraud
12   case, where would this fall in the more complex --
13          MR. STOKES:  It has become complex based
14   on the present legal status, Your Honor.  There's
15   pending motions for a new trial and a number of
16   objections to the presentence report, which are
17   fairly intricate.
18          THE COURT:  Okay.  So I wanted you to get
19   an idea of what -- from people who do this all the
20   time, what it looks like you are looking at, which
21   is upwards of 22 years in prison and defending a
22   pretty complex case handled by someone who does
23   fraud cases, and this is typically in that fraud
24   arena with the other complications he just
25   mentioned.  Do you understand all of that?
```

```
 1   any way?

 2            DEFENDANT SILA:  Yes, Your Honor.

 3            THE COURT:  And I can't tell you what

 4   would be the appropriate approach for your

 5   sentencing arguments or where in the guidelines you

 6   would be most likely to prevail or be successful.

 7   You understand that.

 8            DEFENDANT SILA:  Yes, Your Honor.

 9            THE COURT:  You would be on your own.  Do

10   you understand?

11            DEFENDANT SILA:  Yes, Your Honor.

12            THE COURT:  And do you also understand

13   that -- I will tell you, having been on the bench a

14   long time, that you are going to -- it will be

15   detrimental to you to represent yourself.  I would

16   say it's a bad idea.  You will prejudice yourself in

17   your likelihood of getting a -- you will be more

18   likely to get a sentence that is less favorable to

19   you than if you have counsel who could argue all of

20   the legal aspects of the sentencing guidelines that

21   they are very familiar with.

22            Do you understand that?

23            DEFENDANT SILA:  Yes, Your Honor.

24            THE COURT:  So what I am saying is, I

25   can't tell you not to do this.  I think it would be
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

Appendix 17

1    forward.

2              DEFENDANT SILA:  Yes, Your Honor.

3              THE COURT:  Okay.  And do make sure you

4    understand this.  This cannot be a tactic by you.

5    You have been employing tactics in this case since

6    the beginning to get yourself out of custody.  We've

7    had rounds and rounds of motions and hearings and

8    arguments by you that are a little bit more than --

9    a lot more than what we normally see.  This cannot

10   be a tactic.  We can't get to the sentencing date

11   and all of a sudden as a tactic you change your mind

12   and say, "Now I want counsel, and I've got my briefs

13   filed and I want to use these."  You can't do that.

14             Do you understand that?

15             DEFENDANT SILA:  Yes, Your Honor.

16             THE COURT:  You understand that today, if

17   you tell me that you unequivocally wish to

18   understand -- you understand the downsides of

19   representing yourself.

20             DEFENDANT SILA:  Yes, Your Honor.

21             THE COURT:  And you understand you will

22   likely prejudice yourself and get a higher sentence

23   if you represent yourself.  Do you understand that?

24             DEFENDANT SILA:  Yes, Your Honor.

25             THE COURT:  You still wish to go forward

```
 1   the motion is untimely because it's not filed in the

 2   time period for filing a motion.  Secondly, I denied

 3   the motion on the merits.  I find it was appropriate

 4   the way it was tried, convicted and therefore -- and

 5   additionally charged.  So I deny your motion for new

 6   trial.

 7                Now, is there anything else on the motion

 8   for new trial that you wanted to bring up?

 9                DEFENDANT SILA:  On the new trial on

10   Count 1, as well, I raised the issue of the -- of

11   the death certificate.

12                THE COURT:  Are you talking about what's

13   in your PSR or what's in the motion for new trial?

14                DEFENDANT SILA:  There was a motion for

15   new trial, and there was a motion for acquittal,

16   Your Honor.

17                THE COURT:  Now we are talking about the

18   motion for new trial.

19                DEFENDANT SILA:  New trial, okay.

20                On the issue of untimeliness, the case

21   that the government relied on in its response, I

22   think it's Carlisle.  In the reply, I indicated that

23   it was superseded by statute.  And I gave a case in

24   the 6th Circuit in the reply that shows that the

25   Court has discretion to consider motion outside of
```

```
 1              THE COURT:  All right.  Let's talk about

 2    the motion for acquittal, okay, pro se motion for

 3    acquittal.

 4              DEFENDANT SILA:  The pro se motion for

 5    acquittal relates again to -- to the fact that --

 6    the -- the theft was charged and maybe the

 7    conviction was probably based on sale evidence.

 8              THE COURT:  On what evidence?

 9              DEFENDANT SILA:  Sale evidence.

10              THE COURT:  Sale evidence?

11              DEFENDANT SILA:  The act of me delivering

12    the check.

13              THE COURT:  Okay.  Tell me what you're

14    saying.

15              DEFENDANT SILA:  The indictment alleged

16    that -- alleged theft of public funds.  And the

17    evidence showed sale.  And the Lockhart case,

18    5th Circuit 2016, it says:  When the indictment

19    alleges a particular set of facts as forming the

20    basis for the defendant's violation of the statute

21    but the trial court allows evidence of other facts

22    not alleged in the indictment to form the basis of

23    the jury's guilty verdict, this Court finds a

24    constructive amendment.

25              Which in my case, the indictment alleged
```

```
 1    not valid on its merits as well.

 2            THE COURT:  Okay.  Thank you.  Again, I

 3    find it untimely, and for that reason will not

 4    consider it.  But I also find it fails on the merits

 5    for the same reason I found the other one failed on

 6    the merits, the constructive amendment issue with

 7    regard to Count 1.  So it's denied.

 8            Is there anything else with regard to the

 9    motion for acquittal that we need to take up?

10            DEFENDANT SILA:  For Count 2, which was

11    aggravated identity theft, the 5th Circuit case,

12    Biyiklioglu, which is right there, the 5th Circuit

13    found there were repeated and successful submissions

14    of what show that the defendant knew that the means

15    of identification belonged to another person.  In

16    this case, there was only one -- one occasion.  And

17    like in the 5th Circuit case which was reversed, I

18    think the same applies in this case.

19            THE COURT:  Okay.  Thank you.

20            Mr. Stokes.

21            MR. STOKES:  Your Honor, I believe that

22    the defendant's objection is that there was no proof

23    he knew it was an actual person.  As the PSR

24    indicates -- and I don't have the paragraph -- but

25    he states and is recorded telling the undercover
```

```
 1    agent, "It's a dead person who died long ago."  And
 2    he also provides during this -- as elicited from the
 3    testimony and the evidence, that he -- he provided
 4    the Social Security number and the date of birth on
 5    a taxpayer.  And the courts have held that it's
 6    reasonable to conclude a tax return -- a tax refund
 7    is presumed to be of an actual person, otherwise the
 8    IRS wouldn't have paid for it.  So there's ample
 9    evidence that he knew the identity of Cynthia Short
10    was of an actual person.
11              THE COURT:  Thank you.
12              Mr. Sila, I deny it as untimely.  But on
13    the merits -- putting aside that for a moment that
14    it is untimely, on the merits I deny it for the
15    reasons that Mr. Stokes has stated.
16              Anything else on your motion for
17    acquittal?
18              DEFENDANT SILA:  No, Your Honor.
19              THE COURT:  Okay.  Let's go to your -- to
20    your presentence report, then.  So the motion for
21    acquittal is denied.
22              Now, I want to go through this with you
23    first and then make sure that you have looked at all
24    of this.  Have you looked at the presentence report
25    itself?
```

1   the case.  You're not admitting that you've done it.

2   And that's -- that's a problem maybe to -- I guess

3   to an extent you've admitted something, but not

4   much, and you don't think you should be convicted of

5   this offense or offenses.  And that's of concern to

6   me.

7            We want to make sure that the offense

8   promotes respect for the law, provides just

9   punishment, deters other people from committing

10  these same crimes, and all the other things that it

11  provides for safety of the community, all those

12  other things that 3553(a) factors require.

13           And with all of that in mind, I think the

14  proper sentence is 73 months in custody on Counts 1

15  and 3 to run consecutively with 24 months on

16  Count 2.  Counts 1 and 3 have a two-year -- one- to

17  three-year term of supervised release.  I'm going to

18  make it two years.  Count 1 has a one-year.  It will

19  be a total of two years custody because the

20  two-year -- the one year on Count 2 is to run

21  concurrently with the two years on Counts 1 and 3.

22  So it's two years on Count 1, two years on Count 2

23  and one year -- two years on Count 3, one year on

24  Count 2 to run concurrently, so it's two years

25  running concurrently.

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

Appendix 22

Case 3:16-cr-00443-B   Document 240   Filed 06/23/25   Page 50 of 50   PageID 2204

```
 1              The restitution is $9,443; that's $9,443.
 2              The mandatory special assessments for each
 3    count are $100, which is a total of $300.
 4              It is -- it is -- pursuant to the
 5    Sentencing Reform Act of 1984, it is the judgment of
 6    the Court that the defendant is committed to the
 7    custody of the Federal Bureau of Prisons for a
 8    period of 73 months on Counts 1 and 3 to run
 9    concurrently with each other and 24 months on Count
10    2 to run consecutive to the sentences imposed on
11    Counts 1 and 3.
12              Pursuant to the Mandatory Victim
13    Restitution Act of 1996, the defendant is ordered to
14    pay restitution in the amount of 9,443 payable to
15    the U.S. District Clerk, 1100 Commerce Street, 1452,
16    Dallas, Texas  75242.  Restitution shall be payable
17    immediately and shall be payable to -- disbursed to
18    the Internal Revenue Service in the amount of
19    $9,443.
20              If upon commencement of the term of
21    supervised release any part of the restitution
22    remains unpaid, the defendant shall make payments on
23    such unpaid balance in monthly installments of not
24    less than 10 percent of the defendant's gross
25    monthly income or at a rate of not less than $50 per
```